# AFFIDAVIT
## of
## STACY R. BANKS
## SPECIAL AGENT
## FEDERAL BUREAU OF INVESTIGATION

I, Stacy R. Banks, being duly sworn, do hereby depose and state as follows:

1.     I am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and am assigned to the Jefferson City, Missouri Office.  I have been an SA with the FBI for approximately seventeen (17) years.  In the course of my career, I have participated in numerous investigations concerning violations of Title 18 and 21, United States Code.  I am currently assigned to criminal investigations involving white collar crimes.  I have gained expertise in the conduct of such investigations through training in seminars, classes and everyday work related to these types of investigations.  I have also conducted and assisted with investigations regarding computers, cell phones, and other related electronic storage devices and their use to commit and/or further crimes.  I have been involved in the execution of search warrants to search residences and seize digital evidence including, but not limited to, computers, cell phones, and other related electronic storage devices.

2.     This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits and evidence of crimes against the United States of America including violations of bank fraud (18 U.S.C. § 1344), false statements to a financial institution (18 U.S.C. § 1014), false statements to the Small Business Administration (18 U.S.C. § 1001), aggravated identity theft (18 U.S.C. § 1028A(a)(1)), money laundering (18 U.S.C. § 1957), and conspiracy to commit bank fraud (18 U.S.C. § 1349) (herein referred to as the "Subject Offenses"). There is probable cause to search 508 Summerhill Drive, Jefferson City, Missouri, as described in Attachment A, including DEVICES as described in Attachment B for the information described in Attachment B for evidence of these crimes and contraband or fruits of these crimes.

3.     The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and other persons.  In the course of preparing this affidavit and conducting the present investigation, I have consulted with agents and investigators with specialized training and experience in digital evidence and forensics.  The information in this affidavit is submitted for the limited purpose of establishing probable cause in connection with the present application, and is not intended as a complete statement of all facts related to this investigation.

4.     As discussed below, evidence gathered to date provides probable cause to believe that Tod Ray Keilholz, also known as (a/k/a) Todd Ray Keilholz ("Keilholz") through entities he has operated or controlled – including TRK Construction, LLC; TRK Valpo, LLC; TL Builders, LLC; and Project Design, LLC – has engaged in a scheme to defraud lenders and the U.S. Small Business Administration (SBA) by applying for and obtaining the following loans in the name of the businesses listed based on material falsehoods and omissions:

   a.  TRK Construction, LLC – September 21, 2018 - $976,771 (Hawthorn Bank – Non-PPP Loan)

   b.  TRK Construction, LLC – May 11, 2020 - $1,706,260 (US Bank PPP Loan)

   c.  TRK Valpo, LLC – June 23, 2020 - $3,202,000 (Central Trust Bank PPP Loan)

   d.  TL Builders, LLC – June 30, 2020 - $3,618,815 (US Bank PPP Loan)

   e.  Project Design, LLC – July 20, 2020 - $3,903,857 (US Bank PPP Loan)

Keilholz also applied for or submitted documentation in support of additional PPP loans in the name of the businesses listed based on material falsehoods and omissions; however, US Bank denied the following applications:

   a.  TRK Valpo, LLC – May 28, 2020 - $7,818,705 (US Bank – Initial PPP Loan)

b. TRK Construction, LLC – February 2, 2021 - $2,000,000 (US Bank – Second Round PPP Loan limited to $2,000,000)

c. TL Builders, LLC – January 20, 2021 - $2,000,000 (US Bank – Second Round PPP Loan limited to $2,000,000)

d. Project Design, LLC – February 2, 2021 - $2,000,000 (US Bank – Second Round PPP Loan limited to $2,000,000)

Further, Keilholz sought PPP Loan Forgiveness for the following PPP loans based upon material falsehoods and omissions:

a. TL Builders, LLC – May 20, 2021 (US Bank – for PPP loan funded June 30, 2020)

b. TRK Construction, LLC – September 23, 2021 (US Bank – for PPP loan funded May 11, 2020)

For the purpose of executing the scheme, Keilholz submitted and caused to be submitted information containing material falsehoods to Hawthorn Bank, U.S. Bank, and Central Bank, in violation of Title 18, United States Code, Section 1344.  Additional evidence shows that, after fraudulently obtaining $12,430,932 in PPP loan proceeds, Keilholz conducted and attempted to conduct monetary transactions involving the fraud proceeds in excess of $10,000, in violation of Title 18, United States Code, Section 1957 (Subject Offenses).

5.      As discussed below, in November 2020 Keilholz used $73,543 in PPP loan proceeds to purchase a new 2021 Chevrolet Tahoe for Anthony O. Brockman, who at that time was a US Bank employee who participated in the review of the aforementioned PPP loans both applied for and obtained by Keilholz.  Brockman and Keilholz communicated via cellular phone and Brockman caused PPP loan application documentation to be uploaded to US Bank's computer network.  In order to accomplish these uploads, Brockman would had to have received these

3

documents from Keilholz via communication in electronic form between a computer controlled by Keilholz.

6.     Also, as detailed below, Keilholz has used his residence to further the commission of the Subject Offenses. Accordingly, this affidavit is made for the limited purpose of establishing probable cause to support an application for a warrant to search Keilholz's residence located at 508 Summerhill Drive, Jefferson City, Missouri 65109, described further in Attachment A (the "Subject Premises"), including the DEVICES as described in Attachment B, for evidence, fruits, and instrumentalities described further in Attachment B, concerning the Subject Offenses.

## PROBABLE CAUSE

7.     The SBA was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions and other lenders. These loans had government-backed guarantees.

8.     On March 27, 2020, The CARES Act established several new temporary programs and provided for the expansion of others to address the COVID-19 pandemic. Among these programs, the PPP authorized $349,000,000,000 in forgivable loans to small businesses to retain workers and maintain payroll, make mortgage interest payments, lease payments, and utility payments.

9.     The PPP Borrower Application Form required the borrower to submit documentation that established the borrower's eligibility for the loan and to make a series of certifications in order to be approved for the PPP loan by a financial institution. Acceptable

4

documentation to establish eligibility for the PPP loan included payroll processor records, payroll tax filings, Forms 1099-MISC, bank records, or income and expense forms from a sole proprietorship.

10.    PPP loans were required to be re-paid over two-years at an interest rate of 1%. The maximum loan amount was $10,000,000 per business. PPP loans were forgivable for the sum of documented payroll costs, covered mortgage interest payments, covered lease payments, and covered utilities. Originally, not more than 25% of the forgiven amount could have been spent for eligible non-payroll costs. Later, not more than 40% of the forgiven amount could have been spent for eligible non-payroll costs.

11.    Keilholz was the sole owner of the following entities:

a.    TRK Construction, LLC, (TRK Construction) was organized in the State of Missouri on August 23, 2011. On March 8, 2017, Keilholz changed the business address to 508 Summerhill Drive, Jefferson, City, Missouri (Subject Premises). In a quarterly wage report filed with the Missouri Division of Employment Security (MDES), TRK Construction reported the payment of $220,741.09 wages to nine (9) employees from January 1, 2019, through March 31, 2019. TRK Construction filed no quarterly wage reports with MDES from April 1, 2019, through September 30, 2020. In a quarterly wage report filed with the Indiana Department of Workforce Development (IDWD), TRK Construction reported the payment of $103,099.88 wages to five (5) employees from January 1, 2019, through March 31, 2019. TRK Construction filed no quarterly wage reports with IDWD from April 1, 2019, through September 30, 2020.

b.    TRK Valpo, LLC, (TRK Valpo) was organized in the State of Missouri on February 22, 2017. TRK Valpo filed no quarterly wage reports with MDES from January

5

1, 2019, through June 30, 2020. In a quarterly wage report filed with MDES for the third quarter of 2020, TRK Valpo reported the payment of $145,156.02 wages to MDES for four (4) employees. TRK Valpo filed no quarterly wage reports with IDWD from January 1, 2019, through June 30, 2020. In a quarterly wage report filed with IDWD for the third quarter of 2020, TRK Valpo reported the payment of $85,264.54 wages for five (5) employees.

      c.     TL Builders, LLC, (TL Builders) was organized in the State of Missouri on July 21, 2007. On March 28, 2018, Keilholz changed the business address to 508 Summerhill Drive, Jefferson City, Missouri (Subject Premises). TL Builders filed no quarterly wage reports with MDES from January 1, 2019, through September 30, 2020. TL Builders filed no quarterly wage reports with IDWD from January 1, 2019, through September 30, 2020.

      d.     Project Design, LLC, (Project Design) was organized in the State of Indiana on November 15, 2018, with a principal business address of 1290 Arrowhead Court, Crown Point, Indiana. On February 5, 2019, Keilholz changed the principal address for Project Design to 2005 West Broadway, Suite 100, Columbia, Missouri 65203. Project Design filed no quarterly wage reports with MDES from January 1, 2019, through September 30, 2020. Project Design filed no quarterly wage reports with IDWD from January 1, 2019, through September 30, 2020.

12.     In Small Business Administration (SBA) Paycheck Protection Program (PPP) loan applications, Keilholz identified his wife as an employee of TRK Construction, TRK Valpo, and Project Design, while Keilholz's wife worked as a full-time employee of the State of Missouri as a budget analyst with annual salaries ranging from $35,952 to $52,337. In 2017 and 2018,

6

Keilholz's wife personally guaranteed commercial loans made to TRK Construction, LLC. Between February 21, 2019, and May 9, 2020, Keilholz's wife wrote personal checks identified as "loan," "investment," "Valpo Investment," and "interest on home loan" in the aggregate amount of $216,350.00 to TRK Construction and Project Design. Between May 2020 and December 2020, Keilholz's wife received business checks from TRK Construction, TRK Valpo, and Project Design funded with PPP loan proceeds in the aggregate amount of $325,000 and denominated as "loan repayments."

13. Prior to March 27, 2020, Keilholz, through TRK Construction, had accrued substantial and delinquent indebtedness to American Express, JP Morgan Chase, Citibank, N.A., NWI Medical Realty, LLC, Bell Hospital Systems, the Kansas City Chiefs Football Club, Renal Treatment Centers-Mid Atlantic, Inc., DVA Renal Healthcare, Inc., Renal Treatment Centers-Illinois, Inc., Total Renal Care, Inc., Adams Masonry, C&C Iron, Inc., C&S Concrete Construction, Inc., Circle R Mechanical, Inc., Emcor-Hyre Electric Company of Indiana, Gluth Brothers Roofing Company, Inc., Imboden Construction, Inc., McAllister Leasing & Excavating, Inc., Trout Glass and Mirror, Inc., Kleckner Interior Systems, Inc., Master Tile Carpet One, Inc., Ryan Fire Protection, Inc., and Hawthorn Bank. All or part of these debts were satisfied by PPP loan proceeds.

**Hawthorn Bank**

14. Hawthorn Bank was a financial institution headquartered in Jefferson City, Missouri. The deposits of Hawthorn Bank were insured by the Federal Deposit Insurance Corporation (FDIC), under certificate number 10619. Hawthorn Bank maintained a long-term banking relationship with business entities controlled by Keilholz. After March 27, 2020, Hawthorn Bank participated in the SBA's PPP.

7

15.     On or about August 31, 2017, Keilholz signed Hawthorn Bank promissory note 101010203 in the amount of $550,000 for TRK Valpo, which financed the purchase of and was secured by the real property located at 1425 Glendale, Valparaiso, Indiana.  This loan originally matured on October 15, 2017; however, the maturity date on this loan was extended six times between October 2017 and December 2019, when the maturity date was then extended to February 5, 2020.

16.     On or about January 24, 2018, Keilholz signed Hawthorn Bank promissory note 101011285 in the amount of $1,001,020 for TRK Construction as a line of credit secured by the real property located at 1425 Glendale, Valparaiso, Indiana.  Keilholz and his wife each personally guaranteed this loan, which was originally scheduled to mature on January 24, 2019.  On February 27, 2018, this line of credit was increased to $1,500,000 and the maturity date was extended.  On April 27, 2018, this line of credit was increased to $2,000,000 and the maturity date was extended.  Finally, in December 2019, the maturity date was extended to February 5, 2020.

17.     On or about September 21, 2018, Keilholz signed a Hawthorn Bank promissory note 101011737 in the amount of $976,771 for TRK Construction as a line of credit secured by real properties located at 508 Summerhill Drive, Jefferson City, Missouri, and 3311 Shamrock Drive, Jefferson City, Missouri, and 1425 Glendale, Valparaiso, Indiana.  To obtain this line of credit, Keilholz submitted a document that purported to be his 2017 IRS Form 1040, which materially misstated his income and was never filed with the IRS.  Keilholz and his wife each personally guaranteed this loan, which originally was to mature on March 21, 2019.  The maturity date of this loan was extended three times during 2019, with a maturity date of February 5, 2020, that was established in December 2019.

8

18.     On or about February 7, 2020, the Hawthorn Bank loan officer responsible for Hawthorn Bank loans 101010203, 101011285, and 101011737, wrote a memorandum to those loan files regarding a phone conference with Keilholz.  That memorandum stated, in part, as follows, "The Bank indicated he needed to bring the loans current and demonstrate that the project remains viable or the bank would move forward with aggressive collection or liquidation of collateral."

19.     On February 12, 2020, at approximately 9:56 a.m., Keilholz sent an e-mail to his Hawthorn Bank loan officer, which made the following materially false statements: "Once we have the issue with City taken care of the investors are ready to move forward," and "The lease with be this month or first of next and being finalized. The lease wants to see us moving again to make sure we make next year's deadline for them to move in."

20.     On or about April 28, 2020, Hawthorn Bank entered into a forbearance agreement with TRK Construction and TRK Valpo, and with Keilholz and his wife as guarantors of Hawthorn Bank loans 101010203, 101011285, and 101011737.   Among other things, this forbearance agreement:

a.     Extended the maturity dates of Hawthorn Bank loans 101010203, 101011285, and 101011737, to July 25, 2020;

b.     Required monthly payments of $25,000 to Hawthorn Bank on May 20, 2020, June 20, 2020, and July 20, 2020, on loans 101010203, 101011285, and 101011737;

c.     Required TRK Construction and TRK Valpo, and Keilholz and his wife as guarantors, to immediately take action to correct and cure any violations of any city ordinances, codes, rules, regulations, and/or statutes with respect to any governmental agency of the City of Valparaiso, Indiana, and the State of Indiana;

9

d.      Required TRK Construction and TRK Valpo, and Keilholz and his wife as guarantors, to take action to ensure that their suppliers, laborers, materialmen, or other vendors do not file or record any mechanics liens, or similar liens or encumbrances, with respect to 1425 Glendale Boulevard, Valparaiso, Indiana; and,

e.      Required TRK Construction and TRK Valpo, and Keilholz and his wife as guarantors, to provide Hawthorn Bank with weekly reports, photographs, and status updates on all construction work with respect to 1425 Glendale Boulevard, Valparaiso, Indiana, or within 24 hours of a request by Hawthorn Bank.

21.      On or about July 3, 2020, Keilholz purchased a cashier's check at U.S. Bank National Association in the amount of $3,302,830.61 payable to TRK Construction. This cashier's check was deposited into Hawthorn Bank account ending in 1523 and then applied to the outstanding balances on Hawthorn Bank loans 101010203, 101011285, and 101011737. This cashier's check was funded by the proceeds of a PPP loan made to TL Builders.

**U.S. Bank National Association**

22.      U.S. Bank National Association (US Bank) was a financial institution headquartered in Cincinnati, Ohio, that did business in Jefferson City, Missouri. The deposits of US Bank were insured by the Federal Deposit Insurance Corporation (FDIC), under certificate number 6548. US Bank maintained a banking relationship with business entities controlled by Keilholz. After March 27, 2020, US Bank participated in the SBA's PPP. US Bank made three PPP loans to entities solely owned by Keilholz.

23.      On April 16, 2020, Keilholz applied to US Bank for a PPP loan to TRK Construction. In his application Keilholz identified himself as the sole owner, falsely stated the business had 14 employees and an average monthly payroll of $1,434,424, and falsely certified

10

that the purpose of the loan was to fund payroll, lease and mortgage interest, utilities, and salary/commission. In supporting documentation, Keilholz falsely claimed that TRK Construction had $18,875,308 in gross receipts or sales for 2019. On May 8, 2020, Keilholz signed the SBA Application and Note for a $1,706,260 PPP loan for TRK Construction. On May 11, 2020, the PPP loan proceeds were deposited into TRK Construction's US Bank account ending in 7961.

24.     On May 28, 2020, Keilholz applied to US Bank for a $7,818,705 PPP loan to TRK Valpo based upon a claimed average monthly payroll of $3,127,482. In IRS Schedule C Forms submitted with the application, Keilholz falsely claimed that TRK Valpo had $39,469,429 in gross receipts or sales for 2019. Keilholz submitted materially different and false IRS Forms 941, IRS Schedule C's, and MDES and IDWD quarterly payroll wage reports in his application. On May 28, 2020, in supporting documentation, Keilholz falsely claimed TRK Valpo employed 12 persons during the first quarter of 2019. On June 11, 2020, in revised documentation, Keilholz falsely claimed TRK Valpo employed 170 persons during the first quarter of 2019. On June 18, 2020, US Bank denied this application because it was unable to verify the required payroll information from TRK Valpo.

25.     On June 22, 2020, Keilholz applied to US Bank for a PPP loan to TL Builders. In his application Keilholz identified himself as the sole owner, falsely stated the business had 180 employees and an average monthly payroll of $1,447,526, and falsely certified the purpose of the loan was to fund payroll, lease and mortgage interest, and utilities. In supporting documentation, Keilholz submitted false IRS Forms 940 and 941 that did not identify employees by name or social security number. Anthony Brockman ("Brockman") was a US Bank employee located in Kansas City, Missouri that assisted Keilholz in the loan application process. There are three emails dated June 24, 2020, June 25, 2020, and June 26, 2020 between Keilholz and Brockman in the loan file

11

obtained from US Bank for this PPP loan. On June 30, 2020, Keilholz signed the SBA Application and Note for a $3,618,815 PPP loan for TL Builders. On July 2, 2020, the PPP loan proceeds were deposited in TL Builders' US Bank account ending in 2279. In connection with this loan, Keilholz submitted a Schedule C for TL Builders that falsely reported gross receipts or sales for 2019 in the amount of $27,082,030.

26.     On June 1, 2020, Keilholz applied to US Bank for a PPP loan to Project Design. In his application, Keilholz identified himself as sole owner, falsely stated the business had 18 employees and an average monthly payroll of $1,561,543 and certified the purpose of the loan was to fund payroll, lease and mortgage interest, and utilities. The application reported a business address of 1290 Arrowhead Court, #A, Crown Point, Indiana for Project Design. In supporting documentation Keilholz falsely claimed that Project Design had $34,654,789 in gross receipts or sales for 2019. Keilholz provided US Bank with a MDES Quarterly Contribution and Wage Report for the first quarter of 2020 that falsely purported that Project Design paid 215 employees aggregate wages of $4,785,169. The social security numbers Keilholz associated to 196 of those purported employees did not match the names of the actual persons assigned to those social security accounts. On July 10, 2020, Brockman submitted an email to SBAPPPLoanVerification@usbank.com regarding the Project Design loan stating, "This customer has supplied the documents to get the application going since the extension." On July 20, 2020, Keilholz signed the SBA Application and Note for a $3,903,857 PPP loan for Project Design and the PPP loan proceeds were deposited into Project Design's US Bank account ending in 2290.

27.     According to an interview of Terry Robinson, the landlord for 1290 Arrowhead Court, Suite A, Crown Point, Indiana, Keilholz signed a lease to rent Suite A in 2020 and the lease

expired in March of 2022. Robinson changed the locks on the property and Keilholz still owed Robinson for rent, real estate taxes, and utilities.

28.    The checking account for Project Design ending in 2290 was opened at US Bank on July 11, 2019. The title on the bank statements for the checking account was Todd R. Keilholz, DBA Project Design, LLC, 508 Summerhill Drive, Jefferson City, Missouri, which is the Subject Premises, not the office space in Crown Point, Indiana.

29.    Federal Grand Jury Subpoenas were served on AT&T for subscriber information and toll records for the phone numbers 573-694-6636 and 816-830-2721. According to AT&T, the subscriber for the phone number 573-694-6636 was Keilholz starting on December 24, 2004 and the account was still active on the date of the subpoena. According to AT&T, the subscriber for the phone number 816-830-2721 was Brockman starting on December 24, 2018 and the account was still active on the date of the subpoena. An analysis of the toll records indicated that Brockman initially contacted Keilholz via telephone on June 18, 2020. Between June 18, 2020 and August 6, 2020, Brockman and Keilholz had approximately 53 contacts or attempted contacts telephonically. There was no telephonic contact between Keilholz and Brockman until October 29, 2020. However, Keilholz and Brockman exchanged text messages on October 6, 2020. This was the first date that Keilholz and Brockman exchanged text messages according to the toll records. Between October 29, 2020 and November 4, 2020, Keilholz and Brockman had approximately six telephonic contacts.

30.    On November 4, 2020, while still employed at US Bank, Brockman purchased a 2021 Chevrolet Tahoe, VIN 1GNSKTKL4MR108934, from Jim Butler Linn Chevrolet located at 317 W. Main Street, Linn, Missouri for $73,344. There was also an administrative fee of $199 added to the purchase price of the vehicle. In addition, optional equipment, accessories, and

warranties were purchased in the amount of $5,379. Brockman resided at 11611 N. Crystal Avenue, Kansas City, Missouri at the time of the purchase which was approximately two hours and 50 minutes from Jim Butler Linn Chevrolet. According to an interview with the salesperson for this purchase, Keilholz was with Brockman when the purchase was made. According to Jim Butler Linn Chevrolet's file for this purchase, a cashier's check from US Bank dated November 2, 2020, in the amount of $73,543 was given to Jim Butler Linn Chevrolet for the purchase of this vehicle. A Visa credit card was utilized to pay the remaining $5,379 of the total purchase price for the vehicle. Based upon the information provided by Jim Butler Linn Chevrolet, this Visa credit card appears to belong to Brockman. Keilholz' name appeared nowhere in Jim Butler Chevrolet's file for this purchase.

31.     According to US Bank, the cashier's check was purchased by withdrawals totaling $73,543 from the bank account of TRK Construction, LLC ending in 7961. Based upon a review of the bank records for TRK Construction, LLC, there were no significant deposits into the TRK Construction, LLC bank account after the deposit of the $1,706,260 PPP loan proceeds other than transfers from Keilholz's other business bank accounts, which were also funded by PPP loans. Therefore, the 2021 Chevrolet Tahoe was purchased for Brockman by Keilholz with PPP loan proceeds.

**The Central Trust Bank**

32.     The Central Trust Bank (Central Bank) was a financial institution headquartered in Jefferson City, Missouri. The deposits of Central Bank were insured by the Federal Deposit Insurance Corporation (FDIC), under certificate number 12633. After March 27, 2020, Central Bank participated in the SBA's PPP. Central Bank made one PPP loan to an entity solely owned by Keilholz.

14

33.     On June 17, 2020, Keilholz applied to Central Bank for a PPP loan to TRK Valpo. In his SBA Borrower Application Form, Keilholz identified himself as the sole owner, falsely stated the business had 170 employees and an average monthly payroll of $1,280,806, and falsely certified the purpose of the loan was to fund payroll, lease and mortgage interest, and utilities. Keilholz reported an address for TRK Valpo, LLC of 508 Summerhill Drive, Jefferson City, Missouri (Subject Premises) on the PPP loan application.  In supporting documentation, Keilholz falsely claimed that TRK Valpo had $34,200,282 in gross receipts or sales for 2019.  In supporting documentation, Keilholz included MDES and IDWD wage reports for all of 2019 which falsely claimed that TRK Valpo paid aggregate wages of $15,286,667 to approximately 189 purported employees.  The social security numbers Keilholz associated to 160 of those purported employees did not match the names of the actual persons assigned to those social security accounts.  On June 23, 2020, Keilholz signed a Promissory Note for a $3,202,000 PPP loan for TRK Valpo and the loan proceeds were deposited into TRK Valpo's Central Bank account ending in 5804.

34.     On June 23, 2020, Keilholz opened a Small Business Checking Account at Central Bank in the name of TRK Valpo, LLC and reported the address 508 Summerhill Drive, Jefferson City, Missouri (Subject Premises) to Central Bank as the address for the business.  The address of the Subject Premises was reported on numerous account opening documents that appear to have been signed by Keilholz and was reported on the bank statements for TRK Valpo's bank account.

**Facts Common to PPP Loans Made to TRK Construction, TL Builders, Project Design, and TRK Valpo**

35.     In connection with each of the PPP loans made to TRK Construction, TL Builders, Project Design, and TRK Valpo, in the aggregate amount of $12,430,932, Keilholz had to answer the following question:  "Is the Applicant or any owner of the Applicant an owner of any other

business, or have common management with any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A." Keilholz did not identify his common 100% ownership of TRK Construction, TL Builders, Project Design, and TRK Valpo in any completed PPP loan application.

36.     In connection with the PPP loans made to TRK Construction, TL Builders, Project Design, and TRK Valpo, Keilholz falsely certified the following:

a.     that TRK Construction, TL Builders, Project Design, and TRK Valpo were in operation on February 15, 2020, and had employees to whom salaries were then paid;

b.     that TRK Construction, TL Builders, Project Design, and TRK Valpo were eligible to receive a PPP loan under the SBA rules in effect at the time of the application;

c.     that TRK Construction, TL Builders, Project Design, and TRK Valpo would only use PPP loan proceeds for business-related purposes specified in the loan application and consistent with SBA rules;

d.     that the purpose for the PPP loans to TRK Construction, TL Builders, Project Design, and TRK Valpo included payroll, lease and mortgage interest, and utilities; and,

e.     the information provided in the PPP loan application, and supporting documentation was true and accurate in all material respects.

**Information Obtained from Interviews Conducted**

37.     Michael Purdy was interviewed by the Affiant and another FBI SA on May 23, 2022. Purdy was employed at TRK Construction for approximately two and a half months in 2012 or 2013. Purdy never met Keilholz while he worked for TRK Construction. Purdy was not employed at TRK Valpo in 2019 and had never heard of TRK Valpo. Purdy verified the last four

16

digits of his Social Security Number and his middle initial which matched the information associated with his name that was reported on IDWD quarterly wage reports for TRK Valpo for all four quarters of 2019 that were submitted to Central Bank as supporting documents for the PPP loan that TRK Valpo received.

38.     Marissa Yadron was interviewed by the Affiant and two other Federal Agents on May 24, 2022.  Yadron advised that Keilholz hired her in October of 2018 to do the daily accounting work for his businesses but did not actually begin working for Keilholz until February of 2019.  However, Yadron never received accounting records for Keilholz's businesses and never really did any accounting for his businesses.  Yadron told Keilholz that she would work for him, but she would not correct all of the accounting issues caused by Williams-Keepers, a Certified Public Accounting firm located in Columbia, Missouri.  Yadron told Keilholz that he needed to fix those issues before she would start doing accounting work for him.  Yadron provided Keilholz with advice and answered questions he had about how his financials and payroll were set up by Williams-Keepers.  Yadron did not help Keilholz with the initial PPP loan applications because he was not paying her at that time.  Yadron did not have any conversations with Keilholz about the PPP loans.  Yadron helped Keilholz fill out the PPP loan forgiveness applications for TRK Construction, TRK Valpo, and TL Builders.  When Yadron prepared any documents for Keilholz, the information she put on the documents was based on information that Keilholz provided to her and they communicated through email.

39.     Michael Grubbe was interviewed by the Affiant and another FBI SA on August 17, 2022.  Grubbe was a former employee of TRK Construction, LLC, and advised that he worked for TRK Construction, LLC in an office located at 8350 Saint Clair Avenue, North, #200, Kansas City, Missouri.  Grubbe further stated that Keilholz only visited the Kansas City office of TRK

17

Construction once or twice per year when the Kansas City office was fully operational. Grubbe advised that the landlord for the Kansas City office of TRK Construction told Grubbe to get out of the office space since the landlord had not been paid by TRK Construction. Therefore, TRK Construction, LLC no longer has office space in Kansas City, Missouri. Grubbe did not prepare any financial documents for any of Keilholz's businesses, did not assist Keilholz with any PPP loan applications, and did not create any quarterly wage reports for any of Keilholz's businesses.

40. Keilholz was interviewed on August 10, 2022, by the Affiant and two other Federal Agents. This interview was audio recorded. During the interview, Keilholz stated that he was told by a male US Bank employee located in Kansas City how to fill out the PPP loan applications. Keilholz could not remember the US Bank employee's name and had not met the US Bank employee until he began the PPP loan process. Keilholz also admitted that he sent the PPP loan application documents to US Bank via email. Keilholz used the email addresses TKeil@trkconstruct.com, TKeil@trkvalpo.com and TRK@TLBuilder.com. When asked about the MDES and IDWD quarterly wage reports with false information reported on them that were submitted in support of the PPP loan applications, Keilholz stated that he did not fill in any of the information on the documents, create the quarterly wage reports, or alter the documents in any way. However, Keilholz could not remember who provided the quarterly wage reports to him. Keilholz advised during the interview that he would try to figure out who provided him with the quarterly wage reports containing the false information and contact the Agents with the information. As of the date of this affidavit, Keilholz has not provided that information to the Agents. Keilholz admitted to signing the PPP loan documents electronically at his house, 508 Summerhill Drive, Jefferson City, Missouri (Subject Premises). At the end of the interview, Keilholz told the Affiant that when the Affiant was at his house earlier that day, he was downstairs

18

in his office and had headphones on, so he did not hear the Agents at the door. The Affiant and two other Federal Agents were at 508 Summerhill Drive, Jefferson City, Missouri (Subject Premises) on the morning of the interview and rang the doorbell and knocked on the doors of the residence in an attempt to interview Keilholz.

41.     Brockman was interviewed by the Affiant and another FBI SA on August 29, 2022. During the interview, Brockman admitted to assisting Keilholz with the PPP loan applications for two of Keilholz's companies. Brockman advised that his assistance was simply making sure that Keilholz submitted the documents that US Bank needed in order to process the PPP loan applications because most customers either included too many supporting documents or did not include the correct supporting documents. Brockman denied creating any of the supporting documents that Keilholz submitted for the loan applications. Brockman admitted that Keilholz purchased a Tahoe for him but stated that he saw nothing wrong with it because Brockman intended to purchase the vehicle himself and could have afforded to purchase the vehicle himself. Brockman also admitted that he assisted Keilholz with the submission of the second round of PPP loan applications in early 2021. However, Keilholz was not approved for any of the second-round loans. Brockman quit working for US Bank on May 7, 2021 and did not work for approximately six months.

42.     According to the analysis of Brockman's phone records for the phone number 816-830-2721, Brockman and Keilholz had telephonic contact or attempted telephonic contact with each other approximately 116 times between January 4, 2021 and May 3, 2021. During this time there were consistent text message exchanges between Brockman and Keilholz. After May 3, 2021, Keilholz and Brockman had no further text message exchanges and only had telephonic

contact or attempted telephonic contact eleven times between June 8, 2021 and December 15, 2021.

43.     In summary, the Missouri and Indiana quarterly wage reports submitted in support of the PPP loan applications discussed in the previous paragraphs do not match the wage information submitted to the State of Missouri or the State of Indiana for Keilholz's businesses. In my training and experience, these documents are most easily created with the use of a computer because these forms are available on the internet in fillable pdf format. Based upon the statements of employees interviewed by Federal Agents, no employees helped Keilholz create the quarterly wage reports. Keilholz has no offices in which he can store physical business documents or in which he can work on his computer on items for his four businesses. Based upon reviews of the loan application files that were received for the PPP loans that Keilholz's businesses received from US Bank and Central Bank, and records provided by Hawthorn Bank, there were large amounts of communications between Keilholz and bank representatives that occurred over email. Keilholz admitted that he electronically signed the PPP loan applications from home which is the Subject Premises. During the time period that Keilholz submitted the PPP loan applications, there was no work being performed on the job site where his company was building a medical building in Valparaiso, Indiana and most of Keilholz's employees were collecting unemployment. During the pandemic, most people who were "non-essential employees" were working from home. Therefore, I believe that there is probable cause that Keilholz created the documents on his computer containing false information that were submitted electronically in support of the PPP loan applications for Keilholz's businesses or someone else created the documents containing false information and sent them to him via e-mail. In either of those circumstances, the documents containing false information and the source of the documents would be on Keilholz's computer.

20

In addition, e-mail communications with the former US Bank employee, Anthony Brockman, regarding Brockman's level of assistance in obtaining the PPP loans and applying for the second round of PPP loans for Keilholz's businesses would also be present on Keilholz's computer and/or in the text messages exchanged with Brockman on Keilholz's phone.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

44. Based upon the information set forth above and immediately below, I believe there is probable cause to conclude that within the Subject Premises there is evidence and instrumentalities of the Subject Offenses. Accordingly, I request that the Court issue a search warrant for the Subject Premises, and the DEVICES as described in Attachment B, for the items set forth in Attachment B to this affidavit.

45. Based on the information set forth above, my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I know that it is common for small businesses involved in construction and contracting to keep records relating to the following:

     a. Records (in either electronic or paper form) relating to sales and client transactions, including, but not limited to, financial statements, correspondence, spreadsheets, email messages, records documenting the type of financing services rendered or purchased, including customer lists, transaction dates, the cost of services to be rendered, as well as invoices, letters, and contracts;

     b. Records (in either electronic or paper form) relating to employees and business associates, including, but not limited to, contact books, ledgers, invoices, email communications, correspondence, payments, etc., concerning clients and parties with

21

whom Tod Ray Keilholz a/k/a Todd Ray Keilholz, TRK Construction, LLC, TRK Valpo, LLC, TL Builders, LLC, and Project Design, LLC did business.

46.     Based upon my training and experience, I know that it is necessary for profit-producing businesses like those operated by Tod Ray Keilholz a/k/a Todd Ray Keilholz – even businesses involved in fraudulent transactions – to maintain other books and records sufficient to operate the business and to track income and expenses.  These records typically include (in either electronic or paper form): ledgers, journals, receipts, invoices, bank statements, income tax returns, purchase and sale records, accounts payable and receivable records, customers' files, and payroll records.

47.     Based on my training and experience, I know it is common practice for individuals who are involved in business activities of any nature to maintain books, records, and notes of such business activities for lengthy periods of time, and that individuals who maintain these records keep them in places that are secure but easily accessible, such as in their business offices.

48.     Based on my training and experience, I also know that individuals in business communicate about the business – including its sales, customers, business plans, profits, etc. – in many forms, including via paper memoranda and emails.  These communications are often stored at the business location and on computers and on computer servers maintained by the business.

49.     Based on my training and experience, I know that businesses keep financial records (such as loan applications and the documents supporting the loan applications) in many forms, including electronically.  Consequently, I believe that the documents sought by the search warrant may be stored on computers and laptops used by Tod Ray Keilholz a/k/a Todd Ray Keilholz.  The protocol for the search of the computers and laptops pursuant to this warrant is set forth below and in Attachment B.

50.     Based upon my training and experience, I know that a cellular telephone is a storage device that is capable of storing and transmitting electronic versions of documents described in this affidavit that were utilized by Keilholz to apply for and obtain the PPP loans detailed in the paragraphs above.

## TECHNICAL TERMS

51.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.      Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

23

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

52.     As described above and in Attachment B, this application seeks permission to search for records that might be found within the Subject Premises, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

53.     I submit that if a computer or storage medium is found within the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and email documents used in the bank fraud scheme.  There is reason to believe that there is a computer system currently located within the Subject Premises because the other two business locations that were maintained by Keilholz are no longer accessible to Keilholz.

54.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file

25

(such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically

contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

55. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

28

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

56.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the

29

warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

57.     Because Keilholz shares the Subject Premises as a residence with his wife, it is possible that the Subject Premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

58.　　I submit that this affidavit supports probable cause for a warrant to search the

Subject Premises described in Attachment A, the DEVICES as described in Attachment B, and

seize the items described in Attachment B.

59.　　The facts set forth in this affidavit are true and correct to the best of my knowledge

and belief.

Further, Affiant sayeth not.

**Stacy R. Banks**
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 41

by telephone on this, the 12th day of September, 2022.

**Willie J. Epps, Jr.**
United States Magistrate Judge

31